**DAVIS | MILES**
ATTORNEYS AT LAW

999 East Playa del Norte Drive, Suite 510
Tempe, Arizona 85288
Telephone: (480) 733-6800
efile.dockets@davismiles.com
Taylor J. Barlow, No. 342455
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Tsalach Holdings, LLC d/b/a Blessing Capital, a Wyoming limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>Experian Information Solutions, Inc., a California corporation,<br><br>Defendant. | **CASE NO. 8:25-CV-01831**<br><br>**Complaint for Damages and Injunctive Relief**<br><br>**[Jury Trial Demanded]** |

Plaintiff, Tsalach Holdings, LLC d/b/a Blessing Capital ("Blessing Capital"), by and through its undersigned counsel, hereby alleges the following against Defendant Experian Information Solutions, Inc. ("Experian"):

**<u>Parties</u>**

1.   Plaintiff Blessing Capital is a Wyoming limited liability company with its principal place of business in Tucson, Arizona.

1

2. Blessing Capital is engaged in the business of creating, testing, modifying, verifying systems and procedures related to, and automating documentation of, financial documents and instruments - including standby letters of credit (the "Services").

3. Blessing Capital specifically offers a proprietary Standby Letter of Credit instrument that leverages technology, artificial intelligence, and sound lending principles to assist business owners in establishing and building their credit. Blessing Capital, notably, does not engage in credit repair.

4. Defendant Experian is a corporation organized and existing under the laws of Ohio, with a principal place of business at 475 Anton Boulevard, Costa Mesa, CA 92626.

5. Experian operates as a consumer credit reporting agency and engages in the practice of assembling or evaluating consumer credit information for the purpose of furnishing consumer credit reports to consumers and third parties.

## Jurisdiction and Venue

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises under the Sherman Act (15 U.S.C. § 2), the Clayton Act (15 U.S.C. § 15), the Fair Credit Reporting Act (15 U.S.C. § 1681s-2), and 42 U.S.C.A. § 1981, which are federal laws.

7. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as these claims are so related to the federal claims that they form part of the same case or controversy.

8. Venue is proper in the Central District of California, Orange County, pursuant to 28 U.S.C. § 1391 and Section 8 of the Data Contribution

Agreement, which specifies that any dispute under the agreement "shall be brought in the federal or state courts in Orange County, California."

### Factual Background

9. Blessing Capital has been serving small business owners for over 10 years and has helped fund more than 1,000 businesses nationwide. Accordingly, Blessing Capital has a deep understanding of market requirements.

10. Blessing Capital developed an innovative credit product for small business owners designed to provide available credit when other lenders would not or only at unaffordable rates. Plaintiff invested significant capital, including hundreds of thousands of dollars upfront for compliance, to protect consumers and itself as a business.

11. In August 2024, Blessing Capital sought a third-party software developer to help with application development and reporting, engaging multiple companies before finding non-party Business Warrior.

12. Business Warrior stated they already offered what Blessing Capital needed and were "certified and compliant with Experian." Blessing Capital invested an additional $50,000 and eight months of time in development of the software before the official "soft" launch in April 2025.

13. Blessing Capital subsequently entered into a Data Contribution Agreement ("DCA") with Experian in late 2023, whereby Blessing Capital agreed to deliver consumer data to Experian. Via this DCA, Blessing Capital became a "data furnisher" to Experian so Blessing Capital could report data related to its Letter of Credit program to Experian.

14. Blessing Capital had a successful and compliant relationship with Experian, having worked with them for more than 18 months without receiving any warnings, disputes, or complaints.

15. Blessing Capital submitted Experian's required audits every 45 days during the first year of the relationship with no adverse remarks from Experian.

16. Blessing Capital has expended significant sums to achieve compliance with all of Experian's requirements for accuracy, format, and consumer and business protections – understanding that a partnership with Experian was fundamental to the success of its Letter of Credit program and products.

17. In June of 2025, Experian notified Blessing Capital that it would be immediately terminating Blessing Capital LLC's data furnishing agreements and credentials, but there was not mention of any breach by Blessing Capital of any agreement between the Parties.

18. The termination was unexpected and shocking to Blessing Capital, as it had incurred considerable work and expense to develop its services, and its clients had invested heavily in reliance on Blessing Capital's agreements and relationship with Experian.

19. Upon information and belief, immediately following the termination, Experian began sending false leads to Blessing Capital to "catch" Blessing Capital performing credit repair. This appears to Blessing Capital to be racial profiling, as credit repair services are more common among black and other minority communities and Blessing Capital is a black-owned business working with many other black and other minority business owners.

20. As noted above, Blessing Capital does _not_ provide credit repair services but instead offers products that help small business owners establish and build credit.

21. Providing credit repair services would be anathema to Blessing Capital's services and would risk the good standing of its data furnishing license as a lender.

22. Upon information and belief, Experian further suppressed Blessing Capital's credit-file data to minimize the positive effects for black and Hispanic small business owners that utilized Blessing Capital's services.

## Count One

## Breach of Contract

23. Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above, as though fully set forth herein.

24. Blessing Capital and Experian entered into a valid and enforceable Data Contribution Agreement ("DCA").

25. The DCA, in Section 3, explicitly states that it "may be terminated (i) by the mutual written agreement of the parties; (ii) by either party upon sixty (60) days' prior written notice to the other party . . .; or (iii) by either party if the other party breaches any of the terms and conditions of the Agreement."

26. Experian breached the DCA by purporting to effect an "immediate cancellation" on June 13, 2025, without providing the contractually required sixty (60) days' prior written notice and without asserting any breach by Blessing Capital.

27. As a direct and proximate result of Experian's breach of contract, Blessing Capital has suffered substantial economic damages, including lost profits, loss of goodwill, and reputational harm, and seeks compensatory and punitive damages to be proven with particularity at trial.

/ / /

/ / /

## Count Two

### Refusal to Deal (Sherman Act, § 2)

28. Plaintiff realleges and incorporates by reference the allegations contained the paragraphs above, as though fully set forth herein.

29. Experian possesses monopoly power in the relevant market of business/consumer credit data aggregation and furnishing.

30. Experian is a major credit bureau and holds a dominant place in the market.

31. Experian's conduct demonstrates it believes it holds sole authority and can force out any small business or fintech platform they choose to protect their market position, control the market, and exclude competitors.

32. Experian engaged in anticompetitive conduct by terminating Blessing Capital's data furnishing agreements and credentials. This termination occurred despite Blessing Capital's flawless compliance and 18 months of blemish-free operations.

33. Experian's refusal to deal with Blessing Capital was an unnecessary exclusion and handicap of a competitor without valid business reasons.

34. Experian's actions were motivated by self-preferential and exclusionary purposes. Experian has its own competing products, including Experian Go™, Experian Boost®, and Experian Smart Money™. Its termination of a compliant partner like Blessing Capital serves to reduce competition and solidify its dominant market position.

35. Experian's database and data furnishing services are indispensable facilities for credit-building fintech companies like Blessing Capital. Blessing Capital's innovative fintech platform for business Letters of

6

Credit relies on reporting to major credit bureaus. Denial of access to Experian's services is exclusionary and severely impairs Blessing Capital's ability to compete and scale.

36. The termination of a long-standing, profitable, and compliant course of dealing with a competitor (Blessing Capital) supports a finding of monopolization against Experian.[1]

37. As a direct and proximate result of Experian's unlawful monopolistic conduct, Blessing Capital has suffered substantial economic damages, including lost profits, loss of goodwill, and reputational harm, and seeks compensatory and punitive damages to be proven with particularity at trial.

38. Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Blessing Capital is entitled to recover treble damages, plus costs of suit and reasonable attorney's fees.

## Count Three

### Unfair Competition (California Business and Professions Code § 17200, et seq.; 12 U.S.C.A. § 5536(a)(1)(B))

39. Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above, as though fully set forth herein.

40. Experian's conduct, as described herein, constitutes unfair competition under California law.

41. Experian's termination of Blessing Capital, a compliant partner, to favor its own competing credit-building products, constitutes an unfair

---

[1] See *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) (a monopolist's decision to "make an important change in a pattern of distribution," especially one that existed in a competitive market, could be anticompetitive if not justified by "valid business reason[s].").

7

1 business act or practice. This conduct harms consumers by reducing choice and stifling innovation in the credit-building fintech market.

42. Experian's wrongful termination of the DCA meets the "fraudulent" prong of California's Unfair Competition Law ("UCL"), as it was done without proper notice or justification, and with the apparent intent to gain an unfair competitive advantage by eliminating a disruptive and successful competitor.

43. Such conduct is likely to deceive or mislead consumers about the reliability and continuity of services dependent on Experian's data furnishing.

44. 12 U.S.C.A. § 5536(a)(1)(B) prohibits "unfair, deceptive, or abusive acts or practices" (UDAAP) in connection with consumer financial products or services.

45. Experian's actions of sending false leads to mischaracterize Blessing Capital's business as a credit repair company and suppressing positive credit-file data for business owners from minority communities constitutes unfair or deceptive practices and potentially discriminatory conduct.

46. These actions fall within the broad scope of UDAAP, especially considering Experian's targeting of a black-owned business and Plaintiff's largely minority clientele.

47. As a direct and proximate result of Experian's unfair competition, Blessing Capital has suffered substantial economic damages, including lost profits, loss of goodwill, and reputational harm, and seeks compensatory and punitive damages to be proven with particularity at trial. Blessing Capital seeks all available remedies under the California Business and Professions Code § 17200, et seq., including restitution and injunctive relief.

8

## Count Four

### Unfair Competition (15 U.S.C. § 45)

48. Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above, as though fully set forth herein.

49. 15 U.S.C.A. § 45 prohibits unfair methods of competition or unfair/deceptive acts or practices.

50. Experian terminated Blessing Capital's data furnishing access without cause.

51. Experian sent false leads to mischaracterize Blessing Capital's business as credit repair (either to damage its reputation or regulatory standing, or both).

52. Experian suppressed credit-file data to minimize positive effects for minority business owners.

53. These actions constitute unfair methods of competition or unfair/deceptive acts or practices under 15 U.S.C. § 45.

54. Experian's conduct further constitutes unlawful racial profiling.

55. As a direct and proximate result of Experian's unfair competition, Blessing Capital has suffered substantial economic damages, including lost profits, loss of goodwill, and reputational harm, and seeks compensatory and punitive damages to be proven with particularity at trial. Blessing Capital seeks all available remedies under 15 U.S.C. § 45.

## Count Five

### Discrimination (California Civil Code § 51.5)

56. Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above, as though fully set forth herein.

57. California Civil Code § 51.5 prohibits business establishments from discriminating against, boycotting, blacklisting, or refusing to contract

with individuals (including business entities) on the basis of protected characteristics, including race.

58. Experian's actions, as set forth more fully above, are plausibly interpreted as discrimination or blacklisting based on race.

59. Blessing Capital is a black-owned business, with a clientele made up of largely black and other minority communities.

60. Experian's conduct directly impacts its business-to-business relationships.

61. As a direct and proximate result of Experian's discriminatory behavior, including blacklisting, Blessing Capital has suffered substantial economic damages, including lost profits, loss of goodwill, and reputational harm, and seeks compensatory and punitive damages to be proven with particularity at trial.

## Count Six

### Violation of FCRA § 1681s-2(b)

62. Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above, as though fully set forth herein.

63. At all relevant times, Blessing Capital was a "furnisher" of data to Experian, a "credit reporting agency" ("CRA").

64. As a furnisher, Blessing Capital has statutory duties under FCRA § 1681s-2(b) and Regulation V to investigate consumer disputes regarding the accuracy and completeness of information furnished to the CRAs.

65. These duties include reviewing relevant information and reporting investigation results to the applicable CRA, as well as modifying or deleting inaccurate or unverifiable information.

66. Experian's termination of Blessing Capital's data furnishing agreements cuts off the data flow, directly impeding Blessing Capital's ability to fulfill its statutory duties as a furnisher.

67. Experian's conduct harms consumers by preventing the investigation and correction of inaccurate or incomplete credit reporting information related to Blessing Capital's accounts.

68. Experian's conduct undermines the fundamental goal of the FCRA, which is to ensure the fairness and accuracy of credit reports and the continued operation of the credit reporting system.

69. By unilaterally terminating, without proper cause, Blessing Capital's ability to furnish data and investigate disputes, Experian frustrates the FCRA's objectives.

70. As a direct and proximate result of Experian's violations of the FCRA, Blessing Capital has suffered substantial economic damages, including lost profits, loss of goodwill, and reputational harm, and seeks compensatory and punitive damages to be proven with particularity at trial.

## Count Seven

## Tortious Interference with Contractual Relations

## and Prospective Economic Advantage

71. Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above, as though fully set forth herein.

72. Blessing Capital has established numerous contractual relationships with borrowers and has direct business relationships with over 1,000 small business owners nationwide.

73. These relationships rely on Blessing Capital's ability to report to major credit bureaus, including Experian, to enhance their credit profiles.

74. These relationships yielded over $5 million in Letter of Credit volume, with over 90% retention of customers.

75. Experian had full knowledge of these existing and prospective contractual and business relationships, as Blessing Capital had been reporting to Experian for approximately 18 months and Experian had conducted periodic audits of Blessing Capital's activities.

76. Experian intentionally engaged in wrongful conduct by terminating the DCA without proper notice or justification, with the intent to disrupt Blessing Capital's business and its relationships with its clients and partners.

77. Experian's immediate and unjustified termination directly disrupted Blessing Capital's ability to perform its services, including reporting credit information, which is a key feature of its product and crucial for its clients' credit optimization.

78. This disruption directly interfered with Blessing Capital's existing contracts and prevented it from realizing prospective economic advantages from its established client base and ongoing business development.

79. As a direct and proximate result of Experian's tortious interference, Blessing Capital has suffered substantial economic damages, including lost profits, loss of goodwill, and reputational harm, and seeks compensatory and punitive damages to be proven with particularity at trial.

## Count Eight

### Violation of Equal Rights (42 U.S.C.A. § 1981)

80. Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above, as though fully set forth herein.

81. 42 U.S.C.A. § 1981 prohibits race-based discrimination in the making and enforcement of contracts.

82. Experian terminated Blessing Capital's access to furnish data without cause, sent false leads to suggest Blessing Capital was engaged in credit repair (with an apparent racial profiling motive), and suppressed credit-file data to minimize positive effects for black- and Hispanic-owned business owners (a large swath of Blessing Capital's customers).

83. Blessing Capital is a black-owned business.

84. Experian impaired Blessing Capital's contractual rights and business opportunities on the basis of race, which is actionable under § 1981.

85. Experian also discriminated against Blessing Capital in enforcement of its agreements with Blessing Capital on the basis of race.

86. As a direct and proximate result of Experian's violation of § 1981, Blessing Capital has suffered substantial economic damages, including lost profits, loss of goodwill, and reputational harm, and seeks compensatory and punitive damages to be proven with particularity at trial.

### Count Nine

### Illegal Restraint of Trade

### (Sherman Act, § 2, actionable under 15 U.S.C. § 15)

87. Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above, as though fully set forth herein.

88. 15 U.S.C.A. § 2 makes it illegal for any person to monopolize, or attempt to monopolize, or combine or conspire to monopolize any part of trade or commerce.

89. Experian possesses monopoly power in the relevant market of business credit data aggregation and furnishing.

90. Experian's actions, including terminating Blessing Capital's data furnishing access without cause, sending false leads to mischaracterize

Blessing Capital's business, and suppressing credit-file data to minimize positive effects for minority business owners, are anticompetitive conduct.

91. These actions are part of Experian's strategy to willfully acquire, maintain, or use its monopoly power for anticompetitive or exclusionary purposes, thereby illegally restraining trade and competition in the market for credit-building services for small business owners.

92. As a direct and proximate result of Experian's illegal restraint of trade, Blessing Capital has suffered substantial harm, including lost profits, loss of goodwill, and reputational harm, and seeks compensatory and punitive damages to be proven with particularity at trial.

93. Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Blessing Capital is entitled to recover treble damages, plus costs of suit and reasonable attorneys' fees.

### **Prayer for Relief**

WHEREFORE, Plaintiff Blessing Capital prays for judgment against Defendant Experian Information Solutions, Inc. as follows:

- A. For general, special, and compensatory damages in an amount to be proved at trial;
- B. For treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;
- C. For restitution and disgorgement of ill-gotten gains under California Business and Professions Code § 17200, et seq.;
- D. For punitive damages to deter similar conduct;
- E. For pre- and post-judgement interest as allowed by law;
- F. For its reasonable attorney's fees and taxable costs of suit; and
- G. For other such and further relief as the Court deems just and proper.

## Demand for Jury Trial

Plaintiff demands a trial by jury on all issues so triable.

DATED this 19th day of August, 2025.

                      **DAVIS MILES, PLLC**

By: */s/ Taylor J. Barlow*
    Taylor J. Barlow
    999 E. Playa Del Norte Drive, Suite 510
    Tempe, AZ 85288
    *Attorneys for Plaintiff*